# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **WINNEBAGO TRIBE OF NEBRASKA, a federally recognized Indian Tribe; OMAHA TRIBE OF NEBRASKA, a federally recognized Indian Tribe; VICTORIA KITCHEYAN; CHEYENNE ROBINSON; BRIAN CHAMBERLAIN; RONA STEALER; JAMES LOUIS LaROSE; ARIC ARMELL; ESTHER MERCER; LYNELLE BLACKHAWK; and GREGORY PHILLIPS,**<br><br>        **Plaintiffs,**<br>**v.**<br><br>**THURSTON COUNTY, NEBRASKA; THURSTON COUNTY BOARD OF SUPERVISORS; GLEN MEYER, in his official capacity as Chairman; MARK ENGLISH, in his official capacity as Vice Chairman; GEORGIA MAYBERRY, in her official capacity as Supervisor; JAMES PRICE, SR., in his official capacity as Supervisor; DAVIN FRENCH, in his official capacity as Supervisor; ARNIE HARLAN, in his official capacity as Supervisor; JIM MUELLER, in his official capacity as Supervisor; and PATTY BESSMER, in her official capacity as COUNTY CLERK,**<br><br>        **Defendants.** | **CIVIL ACTION NO.**<br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1.      Pursuant to 52 U.S.C. § 10310 and 42 U.S.C. § 1983, Plaintiffs file this action challenging Thurston County's redistricting plan for the County's Board of Supervisor districts. The new redistricting plan dilutes the voting strength of Non-Hispanic American Indian or Alaska

Native voters of a single race ("American Indians")[1] and voters from the reservations of the Winnebago Tribe of Nebraska and the Omaha Tribe of Nebraska in violation of Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2").

2.     Thurston County has been the subject of violations of the VRA involving two previous redistricting plans for the County's Board of Supervisors. *See United States v. Thurston County, Nebraska*, Civ. No. 78-0-380 (D. Neb. May 9, 1979); *Stabler v. County of Thurston*, 129 F.3d 1015 (8th Cir. 1997). In *Stabler*, the Eighth Circuit found that Thurston County deliberately ignored demographic changes that required creation of a third district in which American Indian voters had an equal opportunity to elect their candidates of choice. *Id.* at 1022. Instead, Thurston County intentionally discriminated against American Indian voters in adopting the Board of Supervisor redistricting plan to ensure that American Indian voters would be subjected to "under-representation" while Non-Hispanic White voters "enjoy[ed] over-representation." *Id.*

3.     Defendants have repeated their pattern of intentional discrimination in their most recent Board of Supervisors redistricting map. American Indian voters now comprise a majority of the County's population of those 18 years of age or older (Voting Age Population or "VAP"). Once again ignoring Thurston County's changing demographics for the purpose of preventing American Indians from having a four-seat controlling majority on the Board of Supervisors, Defendants intentionally adopted a redistricting plan that provides American Indian voters with equal opportunities to elect in just three out of seven Board of Supervisor districts.

4.     In 2011, Thurston County's Board of Supervisors adopted the previous plan that was in effect for elections from 2012 through 2020 ("2011 Plan"). According to the 2010 Census,

---

[1] For ease of reference, the balance of the Complaint will refer to the Non-Hispanic American Indian or Alaska Native population in Thurston County as "American Indian." Similarly, all references will be to "American Indians" of a single race unless otherwise stated.

District 3 in the 2011 Plan had an American Indian VAP of 64.80 percent. Following the 2020 Census, District 3 had an American Indian VAP of 68.11 percent.

5.      Following the 2020 Census, Defendants adopted a redistricting plan, "Proposed Plan 1," that lowered the American Indian VAP in District 3 from 68.11 percent to 62.64 percent. Despite the increase of American Indian VAP and decrease of Non-Hispanic White VAP in Thurston County, in District 3 under Proposed Plan 1 Defendants increased the number of Non-Hispanic Whites of voting-age from 172 to 207 while decreasing the number of American Indians of voting-age from 393 to 389.

6.      Defendants knew from data and testimony provided by American Indians during public hearings on Proposed Plan 1 that Board of Supervisor districts with an American Indian VAP of approximately 62.64 percent in District 3 and 52.84 percent in District 5 would deny American Indian voters an equal opportunity to elect their candidates of choice from those districts. Nevertheless, Defendants intentionally discriminated against American Indian voters by initially adopting Proposed Plan 1.

7.      Tribal representatives and American Indian voters denounced Proposed Plan 1 for failing to provide equal voting opportunities to American Indian voters.  Defendants responded by rescinding that plan and adopting an even more dilutive redistricting plan. Specifically, through "Adopted Plan 3," Defendants further reduced the American Indian VAP in District 3 from 62.64 percent to 59.50 percent by increasing the number of voting-age Non-Hispanic Whites to 223 and further lowering the number of voting-age American Indians to 360. Defendants also further decreased the American Indian VAP in District 5 from 52.84 percent to 51.26 percent.

8.      Defendants enacted Adopted Plan 3 with the intent to discriminate against American Indian voters by: (a) denying American Indian voters equal opportunities to elect

candidates of their choice in District 3; and (b) denying them an opportunity to have a controlling majority of the Thurston County Board of Supervisors for the next 10 years. Defendants engaged in this intentional discrimination in the face of the growing American Indian population in Thurston County and its declining Non-Hispanic White population.

## I.     INTRODUCTION

9.     On January 3, 2022, the Thurston County, Nebraska Board of Supervisors (the "Board of Supervisors" or the "Board") enacted a redistricting plan for Thurston County's Board of Supervisor districts ("Plan 3"), which has the effect of diluting the ability of American Indian voters to elect candidates of their choice.

10.     American Indians are the largest single population group in Thurston County when measured by total population or by VAP.

11.     Nebraska and Thurston County have a lengthy history of submerging and suppressing the participation of American Indian voters in the political process, including previous judicial findings of vote dilution in the method of electing the County's governing body.

12.     The Board of Supervisors is the legislative body of the county determining issues critical to county residents' daily lives such as budgeting for county services and roads, taxing, issuing of bonds, zoning, and adopting other regulations by ordinance. The Board is comprised of seven Supervisors elected from single-member districts.

13.     In the past decade, the County's total population has declined, driven by the loss of Non-Hispanic White residents, which decreased by over ten percent between the 2010 Census and the 2020 Census, from 2,739 people in 2010 to 2,444 people in 2020. During that same ten-year period, the population of American Indian residents increased marginally in numbers but substantially in their proportion of the County's population.

14.     Despite comprising approximately 36.1 percent of the County's total population and 43.5 percent of the VAP in 2020, Non-Hispanic White voters of a single race control the election outcomes in a majority of the Board of Supervisor districts, currently holding five out of seven Supervisor seats.

15.     The number of voting-age American Indians in Thurston County is sufficiently large and geographically compact to constitute an effective majority in at least four single-member districts; the American Indian voters in the County are politically cohesive; and the County's Non-Hispanic White residents vote sufficiently as a bloc to enable them usually to defeat the preferred candidates of American Indian voters in districts in which American Indians do not have an effective voting majority.

16.     Under the totality of the circumstances, including the historical, socioeconomic, and electoral conditions of Thurston County, Plan 3 in effect for Board of Supervisor elections from 2022 to 2030 violates Section 2 of the Voting Rights Act. *Thornburg v. Gingles*, 478 U.S. 30 (1986).

17.     For these reasons, Plaintiffs seek an order: (i) declaring that Plan 3, which is in effect for Board of Supervisor elections from 2022 through 2030, violates the Voting Rights Act; (ii) permanently enjoining Defendants from conducting future elections under that districting plan; (iii) requiring implementation of a new districting plan that is consistent with the Act's requirements; and (iv) providing such additional relief as is appropriate.

## II.     PARTIES

**The Plaintiffs**

18.     Plaintiff WINNEBAGO TRIBE OF NEBRASKA is a federally recognized Indian tribe whose reservation and off-reservation trust lands are located in the northern part of Thurston

County and Dixon County, Nebraska, and Woodbury County, Iowa, and is headquartered in Winnebago, Nebraska (in Thurston County). Plaintiff WINNEBAGO TRIBE OF NEBRASKA has the purpose of promoting the cultural, economic, political, and social welfare of its citizens. Citizens of the WINNEBAGO TRIBE OF NEBRASKA include U.S. citizens who are registered to vote or are eligible to register to vote in Thurston County, Nebraska for federal, state, and local elections. The voting strength of citizens of the WINNEBAGO TRIBE OF NEBRASKA is diluted by the Section 2 violations alleged herein. Plaintiff WINNEBAGO TRIBE OF NEBRASKA sues on its own behalf and in a representational capacity on behalf of its affected citizens that it represents.

19.     Plaintiff OMAHA TRIBE OF NEBRASKA is a federally recognized Indian tribe whose reservation and off-reservation trust lands are located in the southern part of Thurston County and northeastern Cuming County, Nebraska, with small portions of the reservation extending into the northeast corner of Burt County, Nebraska and across the Missouri River into Monona County, Iowa, and is headquartered in Macy, Nebraska (Thurston County). Plaintiff OMAHA TRIBE OF NEBRASKA has the purpose of promoting the cultural, economic, political, and social welfare of its citizens. Citizens of the OMAHA TRIBE OF NEBRASKA include U.S. citizens who are registered to vote or are eligible to register to vote in Thurston County, Nebraska for federal, state, and local elections. The voting strength of citizens of the OMAHA TRIBE OF NEBRASKA is diluted by the Section 2 violations alleged herein. Plaintiff OMAHA TRIBE OF NEBRASKA sues on its own behalf in a representational capacity on behalf of its affected citizens that it represents.

20.     Plaintiff VICTORIA KITCHEYAN is a citizen of the WINNEBAGO TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. She resides and

votes in Thurston County Supervisor District 4 under Plan 3. Because of the violation of Section 2 of the Voting Rights alleged in this complaint, she and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

21.     Plaintiff CHEYENNE ROBINSON is a citizen of the OMAHA TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. She resides and votes in Thurston County Supervisor District 3 under Plan 3. Because of the violation of Section 2 of the Voting Rights alleged in this complaint, she and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

22.     Plaintiff BRIAN CHAMBERLAIN is a citizen of the WINNEBAGO TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. He resides and votes in Thurston County Supervisor District 4 under Plan 3. Because of the violation of Section 2 of the Voting Rights alleged in this complaint, he and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

23.     Plaintiff RONA STEALER is a citizen of the WINNEBAGO TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. She resides and votes in Thurston County Supervisor District 2 under Plan 3. Because of the violation of Section 2 of the Voting Rights alleged in this complaint, she and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

24.     Plaintiff JAMES LOUIS LaROSE is a citizen of the WINNEBAGO TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. He resides and votes in Thurston County Supervisor District 2 under Plan 3. Because of the violation of Section 2 of the Voting Rights alleged in this complaint, he and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

25.     Plaintiff ARIC ARMELL is a citizen of the WINNEBAGO TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. He resides and votes in Thurston County Supervisor District 2 under Plan 3. Because of the violation of Section 2 of the Voting Rights alleged in this complaint, he and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

26.     Plaintiff ESTHER MERCER is a citizen of the WINNEBAGO TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. She resides and votes in Thurston County Supervisor District 2 under Plan 3. Because of the violation of Section 2 of the Voting Rights Act alleged in this complaint, she and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

27.     Plaintiff LYNELLE BLACKHAWK is a citizen of the WINNEBAGO TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. She resides and votes in Thurston County Supervisor District 2 under Plan 3. Because of the violation of Section 2 of the Voting Rights Act alleged in this complaint, she and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

28.     Plaintiff GREGORY PHILLIPS is a citizen of the OMAHA TRIBE OF NEBRASKA and a resident and registered voter of Thurston County, Nebraska. He resides and votes in Thurston County Supervisor District 5 under Plan 3. Because of the violation of Section 2 of the Voting Rights Act alleged in this complaint, he and other American Indian voters in Thurston County do not have an equal opportunity to elect candidates of their choice.

**The Defendants**

29.     Defendant THURSTON COUNTY, NEBRASKA (the "County"), is a geographical and political subdivision of the State of Nebraska, located within the District of

Nebraska. This action is brought against those officials of the County who are charged with ensuring its compliance with applicable state and federal voting laws, including Section 2 of the Voting Rights Act.

30.     Defendant THURSTON COUNTY BOARD OF SUPERVISORS, established under Nebraska law, is the governing authority of the County. Neb. Const. art. IX, § 4; Neb. Rev. Stat. Ann. §§ 23-103, 23-113.03. The Board of Supervisors provides local government services in Thurston County and has the legislative power to adopt laws affecting its affairs and local government. In particular, the Board of Supervisors is responsible for adopting the redistricting plan governing the election of its members, including the redistricting plan at issue in this case, Plan 3, through the state's requirement that "[t]he governing board of each such political subdivision shall be responsible for drawing its own district boundaries" ensuring that "such districts shall be substantially equal in population as determined by the most recent federal decennial census." Neb. Rev. Stat. Ann. §§ 32-553(1)(a), (2).

31.     Defendants GLEN MEYER, GEORGIA MAYBERRY, MARK ENGLISH, JAMES PRICE, SR., DAVIN FRENCH, ARNIE HARLAN, and JIM MUELLER are the members of the Board of Supervisors. Each Defendant is sued in his or her official capacity.

32.     Defendant PATTY BESSMER is the Thurston County Clerk (the "County Clerk"). Nebraska law provides that "[t]he county clerk shall have the powers and perform the duties assigned to the election commissioner" in counties such as Thurston County that do not have a Board of Election Commissioners. Neb. Rev. Stat. Ann. § 32-218(1). The powers and duties include those under "the Election Act relating to the registration of voters and the conduct of elections" including those for the County Board of Supervisors under redistricting Plan 3 at issue in this case. *Id.* Defendant BESSMER is being sued in her official capacity.

### III.   <u>JURISDICTION</u>

33.   This Court has jurisdiction of this action pursuant to (a) 28 U.S.C. § 1343(a) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Voting Rights Act (58 U.S.C § 10101, *et seq*., including 52 U.S.C. § 10308(f)); (b) 28 U.S.C. § 1357 because this action seeks to enforce the right of citizens of the United States to vote; (c) 42 U.S.C. § 1983 because Defendants have, under color of state law, deprived Plaintiffs of their right to vote in violation of the Voting Rights Act; and (d) 28 U.S.C. § 1331 because this action arises under the laws of the United States.

34.   This Court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

35.   This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

36.   This Court has jurisdiction to award Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

37.   This Court has personal jurisdiction over the Defendants, all of whom, on information and belief, are citizens of the State of Nebraska who reside within this District.

38.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### IV.   <u>FACTUAL BACKGROUND</u>

39.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the

United States to vote on account of race or color." A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [a minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b). An electoral regime that dilutes the voting strength of a community of color may deprive the members of that community of their right to an equal opportunity to elect representatives of their choice, within the meaning of Section 2.

40.     In Thurston County, Nebraska, American Indians are the largest population group, comprising 57.5 percent of the total population and 50.3 percent of the VAP.

41.     Plan 3 distributes American Indian voters in a way that produces: (a) three Board of Supervisors Districts, Districts 2, 4, and 6, in which American Indians comprise 78.25 percent, 87.01 percent, and 96.65 percent of the VAP, respectively; (b) two Board of Supervisors Districts, Districts 3 and 5, in which American Indians comprise 59.50 percent and 51.26 percent of the VAP, respectively, but which are ineffective in providing American Indians an equal opportunity to elect their candidates of choice; and (c) two other Board of Supervisors Districts, Districts 1 and 7, in which American Indians nominally comprise 1.32 percent and 7.07 percent of the VAP, respectively, and American Indians are ineffective electoral minorities. *See* Figure 7.

42.     Adopted Plan 3 denies American Indian voters in Thurston County an equal opportunity to participate in the political process and to elect representatives of their choice.

A.     **Thurston County Demographics**

43.     Thurston County lies in northeastern Nebraska, with the Missouri River and the State of Iowa forming its eastern boundary.

44.     The reservations of the Omaha Tribe of Nebraska and the Winnebago Tribe of Nebraska comprise Thurston County's entire land mass; the Winnebago Reservation is in the northern portion of the County, and the Omaha Reservation is in the southern portion of the County.

45.     Thurston County's population has declined over the past decade.

46.     According to the 2010 Census, the County had a total population of 6,940. According to the 2020 Census, the County had a total population of 6,773, which is a decrease of 2.4 percent (167 people) from 2010.

47.     Non-Hispanic White residents experienced the largest decrease of total population in Thurston County of any population group between the 2010 Census and the 2020 Census, decreasing by 10.8 percent (295 people) during that ten-year period.

48.     By contrast, during the past decade, the American Indian population has increased slightly in Thurston County and now comprises a majority of the County's VAP.  *See* Figure 1.

49.     According to the 2010 Census, there were 3,890 American Indians, comprising 56.1 percent of the County's total population.

50.     According to the 2020 Census, there were 3,897 American Indians, comprising 57.5 percent of the County's total population.

51.     American Indians are the largest racial or ethnic group in terms of VAP. According to the 2020 Census, the County had a VAP of 4,510, of whom 2,269 (50.3 percent) were American Indians.

52.     The 2020 Census demographics for Thurston County are as follows:

**Figure 1. Thurston County Population (2020 Census).**

|  | **Total Population** | | **Voting Age Population (VAP)** | |
|---|---|---|---|---|
| Non-Hispanic American Indian and Alaska Native Alone | 3,897 | 57.5% | 2,269 | 50.3% |
| Non-Hispanic White Alone | 2,444 | 36.1% | 1,961 | 43.5% |
| Non-Hispanics of Some Other Race Alone | 172 | 2.5% | 135 | 3.0% |
| Hispanics of any Race | 260 | 3.8% | 145 | 3.2% |
| Total | 6,773 | | 4,510 | |

Source: U.S. Census, 2020 Census Redistricting Data Pub. L No. 94-171 89 Stat.1023 (1975) Summary File, Hispanic or Latino, and Not Hispanic or Latino by Race, Tables P2 and P4.

53.     Figure 2 is a choropleth-shaded map depicting the concentration of the American Indian total population in Thurston County by township, according to the 2020 Census. County subdivisions with darker colors indicate a higher percentage of American Indians. County subdivisions with lighter colors depict a smaller number of American Indians.

**Figure 2. American Indian Total Population in Thurston County (2020 Census).**



Source: U.S. Census, 2020 Census Redistricting Data Pub. L 94-171 89 Stat.1023 (1975) Summary File, Total Population by Race, Table P1, American Indian Alaska Native alone.

13

54.     As Figure 2 depicts, the highest concentration of American Indian total population in Thurston County is found in the eastern half of the County.

**B.     The Thurston County Board of Supervisors and its Enactment of Adopted Plan 3**

55.     The County's Board of Supervisors is comprised of seven members elected from single-member districts to four-year, staggered terms. Neb. Rev. Stat. Ann. § 32-528(2).

56.     To ensure that Board of Supervisor terms are staggered, Nebraska law provides that following the first general election under a board of supervisors, "one supervisor shall be elected in each odd-numbered supervisor district at the general election two years after the first general election and each four years thereafter, and one supervisor shall be elected in each even-numbered supervisor district at the general election four years after the first general election and each four years thereafter." Neb. Rev. Stat. Ann. § 32-529; *compare id. with* Neb. Rev. Stat. Ann. § 32-528(1) (stating a similar procedure for seven-member county commissions).

57.     Stated another way, odd-numbered Supervisor seats are filled through elections in mid-term election years and even-numbered Supervisor seats in Presidential Election years. *See* Neb. Rev. Stat. Ann. § 32-529.

58.     Applying that schedule of staggered term elections to Thurston County, Supervisors were elected in 2022 from Districts 1, 3, 5, and 7; Supervisors from Districts 2, 4, and 6 will be elected in the next Presidential election year scheduled in 2024. *See generally* Thurston Cty. Clerk, Election Results, *available at* https://thurstoncountynebraska.us.

59.     Supervisors must be registered voters and reside within the district from which they are elected, although they need not be a resident of the district when they first file for candidacy. *See* Neb. Rev. Stat. Ann. § 32-528(2) (requiring that supervisors must meet the same requirements

14

for holding office as the requirements for commissioners under Neb. Rev. Stat. Ann. § 23-150(1));

*see id.* at Neb. Rev. Stat. Ann. § 23-268 (commissioner requirements).

60.     The elections for the Board of Supervisors are partisan, and primary elections are

held to determine which candidates advance to the general election. *See* Neb. Rev. Stat. Ann. §

32-528(2).

61.     State law provides that the "supervisor districts may be changed after each state and

federal census if it appears from an examination that the population has become unequal among

the several districts." Neb. Rev. Stat. Ann. § 23-269. If a change in district boundaries is needed,

"the county board shall make such a change in boundary at its next regular meeting after such

change or amendment takes effect." *Id.*

62.     The requirements for supervisor districts are provided by statute:

> Such districts shall be divided as nearly as possible with regular boundary lines and
> in regular and compact form and shapes, and each of such districts shall as nearly
> as possible have the same number of inhabitants as any other district. No voting
> precinct shall be divided by any such district, except that in counties having cities
> of more than one thousand inhabitants as determined by the most recent federal
> decennial census or the most recent revised certified count by the United States
> Bureau of the Census and when such cities have more inhabitants than the average
> outlying district, the county board shall add enough contiguous territory to such
> city so that the inhabitants in such city and contiguous territory equal the inhabitants
> of two of the other districts…. The remainder of the county outside of such city
> districts shall be divided so as to create a total of seven supervisor districts…

Neb. Rev. Stat. Ann. § 23-204.

63.     Thurston County contracted with gWorks, a private vendor that offers Geographic

Information System ("GIS") services and software targeted at local governments, to prepare the

redistricting maps for the Board of Supervisors following the U.S. Census Bureau's release of the

Pub. L. No. 94-171 redistricting data from the 2020 decennial census.

64.    At a meeting with the Board on October 25, 2021, County Clerk Patty Bessmer presented a proposed redistricting plan prepared by gWorks, "Proposed Plan 1." *See* Figure 3.

**Figure 3. Board of Supervisors Proposed Plan 1 (Rescinded).**



65.    Upon information and belief, Proposed Plan 1 was not distributed to the public before the Board of Supervisors' December 20, 2021 meeting.

66.    Proposed Plan 1 created three American Indian ability-to-elect districts with the following VAP percentages: District 2 (75.52%); District 4 (86.35%); and District 6 (96.69%). Although two additional districts would be majority-American Indian, District 3 (62.64%) and District 5 (52.84%), they would not perform effectively as American Indian ability-to-elect districts because of lower American Indian voter turnout combined with bloc voting by Non-Hispanic Whites. *See infra* Figure 7.

67.    On December 17, 2021, Plaintiff Victoria Kitcheyan, Chairwoman of the Winnebago Tribe of Nebraska ("Chairwoman Kitcheyan"), submitted a letter to the Board of Supervisors on behalf of her Tribe and other American Indian voters "to ensure that we have fair representation in this County's government."

68.    In her letter, Chairwoman Kitcheyan pointed out the County's demographics required adoption of a redistricting plan that "would establish four majority American Indian districts in Thurston County."

69.    Chairwoman Kitcheyan's letter attached an illustrative plan that met all requirements of federal and state law, including being compact and comprised of contiguous territory that was substantially equal in population. The plan also observed political and geographic boundaries, "keeping most major towns in Thurston County within a single district" while preserving communities of interest. *See* Figure 4.

**Figure 4. Winnebago/Omaha Proposed Plan for Board of Supervisors.**



70.     The Omaha Tribe of Nebraska joined the Winnebago Tribe of Nebraska in the plan that Chairwoman Kitcheyan submitted to the Board.

71.     The Winnebago/Omaha Proposed Plan would have created four American Indian ability-to-elect districts with the following VAP percentages in the plan's districts: District 1 (85.58%); District 2 (85.64%); District 3 (97.58%); and District 4 (65.93%). *See* Figure 5.

**Figure 5. 2020 Census Demographics of Winnebago/Omaha Proposed Plan.**

| District | Total Population | Deviation Percentage | American Indian Percent of Total Population | American Indian Percent of VAP |
|---|---|---|---|---|
| 1 | 988 | 2.11% | 90.38% | 85.58% |
| 2 | 976 | 0.87% | 90.06% | 85.64% |
| 3 | 971 | 0.35% | 98.87% | 97.58% |
| 4 | 972 | 0.46% | 72.22% | 65.93% |
| 5 | 972 | 0.46% | 39.51% | 33.85% |
| 6 | 968 | 0.04% | 3.00% | 2.48% |
| 7 | 926 | -4.30% | 14.36% | 9.59% |

Source: U.S. Census, 2020 Census Redistricting Data (Pub. L. No. 94-171) Summary File, Hispanic or Latino, and Not Hispanic or Latino by Race, Tables P2 and P4.

72.     Chairwoman Kitcheyan appeared at the next scheduled Board of Supervisors meeting on December 20, 2021 to discuss the Supervisor districts and the Winnebago/Omaha Proposed Plan. After she answered questions from some of the Supervisors, the Board tabled redistricting.

73.     The Supervisors scheduled redistricting for a special meeting on December 28, 2021 so that a representative of the Secretary of State's office and a GIS analyst could attend.

74.    In a letter dated December 28, 2021, Chairwoman Kitcheyan supplemented her previous letter with additional information to explain why, unlike the Winnebago/Omaha Proposed Plan, the Board's Proposed Plan 1 did not comply with the VRA.

75.    Chairwoman Kitcheyan explained that Proposed Plan 1 violated the VRA because "Districts 3 and 5, although they are on paper majority Native, do not provide a large enough majority to provide a realistic opportunity to elect in a real-life contest."

76.    In a special meeting on redistricting held on December 28, 2021, the Board considered the two competing plans, Proposed Plan 1 and the Winnebago/Omaha Proposed Plan.

77.    Attendees at the December 28, 2021 Board meeting included among others: Wayne Bena, Chief Deputy Secretary of State of Elections; Gwen Porter on behalf of the Omaha Tribe of Nebraska; Chairwoman Kitcheyan and Andrea Snowball on behalf of the Winnebago Tribe of Nebraska; other American Indian voters; and Emily DeLisle, on behalf of the Native American Rights Fund, who participated by telephone.

78.    Some of the Supervisors questioned Chairwoman Kitcheyan about the Winnebago/Omaha Proposed Plan, suggesting that it could not be considered a viable plan "since it was not created by a redistricting contractor approved by the state of Nebraska," or words to that effect.

79.    Chief Deputy Secretary of State Bena contended that any plan adopted by the Board would be immunized from a successful legal challenge because he said that gWorks "will not sign off on a map that does not meet legal requirements," or words to that effect.

80.     Chief Deputy Secretary of State Bena defended Proposed Plan 1 in part by stating his opinion that any district that had an American Indian population exceeding 50 percent satisfied

the VRA and that increasing the percentage of American Indian population so that there were only four American Indian "board seats could be considered packing," or words to that effect.

81.     Then-Board Member Dan Trimble then made a motion to approve Proposed Plan 1, which was seconded. The Board approved it by a vote of 5 to 1, with Board Member James Price, Sr. (Winnebago Tribal citizen) being absent.

82.     Prior to the next Board meeting scheduled for January 3, 2022, the Board published its proposed agenda, which included an action item to rescind the vote on Proposed Plan 1.

83.     In a letter dated January 3, 2022, Chairwoman Kitcheyan provided additional feedback on Proposed Plan 1 and the discussion at the December special meeting to consider as part of the Board's contemplation of the rescission of Proposed Plan 1:

    a.     She explained that the Board's use of gWorks to prepare the plan did not insulate the Board from its duty to comply with the VRA;

    b.     She pointed out that the Winnebago/Omaha Proposed Plan offered equal opportunities to elect American Indian voters in four out of seven districts, approximately equal to their percentage of the population, and therefore was not unlawful packing;

    c.     She decried the Board's lack of transparency in failing to make Proposed Plan 1 available to the public in advance and its failure to invite the two tribes to participate in the redistricting process; and

    d.     She urged the rescission of Proposed Plan 1 and the adoption of the Winnebago/Omaha Proposed Plan.

84.     At the January 3, 2022 regular Board meeting, the five non-Hispanic White Board members voted to rescind Proposed Plan 1. Supervisor James Price, Sr. (Winnebago Tribal citizen), abstained. Supervisor Arnie Harlan (Omaha Tribal citizen), was absent.

85.     Supervisor Price (Winnebago Tribal citizen) then made a motion to adopt the Winnebago/Omaha Proposed Plan. His motion failed due to a lack of a second.

86.     Supervisor Mayberry made a motion that was seconded by Supervisor Mark English to adopt a new redistricting map, Adopted Plan 3, which was presented to the Board by County Clerk Patty Bessmer. The motion passed by a vote of 5 to 1.  Supervisor Price (Winnebago Tribal citizen) voted no. Supervisor Harlan (Omaha Tribal citizen) was absent.

87.     Upon information and belief, Plan 3 was not provided to the public or the tribes in advance of the January 3, 2022 meeting. Instead, it was only made available to the public after its adoption. A map of Adopted Plan 3 is provided below as Figure 6.

**Figure 6. Board of Supervisors Adopted Plan 3.**



88.     Adopted Plan 3 created only three American Indian ability-to-elect districts with the following VAP percentages: District 2 (78.25%); District 4 (87.01%); and District 6 (96.65%). *See* Figure 7.

89.     Adopted Plan 3 decreases the American Indian VAP in two additional districts, further weakening the expected American Indian voter performance of those districts compared to Proposed Plan 1.  Under Adopted Plan 3, those two districts still would be majority-American Indian, but with even fewer voters than under Proposed Plan 1. District 3 would drop by more than three percentage points of the VAP, from 62.64% American Indian VAP under Proposed Plan 1 to 59.50% American Indian VAP under Adopted Plan 3. District 5 would drop by over 1.5 percentage point of the VAP, from 52.84% American Indian VAP under Proposed Plan 1 to 51.26% American Indian VAP under Adopted Plan 3. *See* Figure 7.

90.     The Board enacted Adopted Plan 3, which engages in packing by increasing the American Indian VAP of two super-majority American Indian VAP districts (Districts 2 and 4), while decreasing the American Indian VAP in the two districts that already diluted American Indian voting power (Districts 3 and 5).

91.     Figure 7 compares the demographics under each of the redistricting plans, illustrating how the Board of Supervisors diluted American Indian voting power in Proposed Plan 1 and further diluted American Indian voting power in Adopted Plan 3 after representatives of the Omaha Tribe of Nebraska and the Winnebago Tribe of Nebraska offered public testimony arguing against the dilution of American Indian voting power under Proposed Plan 1.

**Figure 7. Comparison of American Indian VAP in Thurston County Districts, by Plan.**

|  | 2011 Plan (2010 Census) | 2011 Plan (2020 Census) | Proposed Plan 1 (Rescinded) | Adopted Plan 3 |
|---|---|---|---|---|
| **District 1** | 2.21% | 2.19% | 1.20% | 1.32% |
| **District 2** | 79.70% | 78.16% | 75.52% | 78.25% |
| **District 3** | 64.80% | **68.11%** | 62.64% | 59.50% |
| **District 4** | 86.06% | 90.88% | 86.35% | 87.01% |
| **District 5** | 52.76% | 47.86% | 52.84% | 51.26% |
| **District 6** | 90.81% | 98.17% | 96.69% | 96.65% |
| **District 7** | 2.06% | 10.66% | 6.65% | 7.07% |

Source: U.S. Census, 2020 Census Redistricting Data (Pub. L. No. 94-171) Summary File, Hispanic or Latino, and Not Hispanic or Latino by Race, Tables P2 and P4. Key demographic changes in District 3 between plans are indicated by bold type to depict an increase in American Indian VAP and by red type to depict a decrease in American Indian VAP.

92. The Board's decision to rescind Proposed Plan 1 to further dilute American Indian voting power in Adopted Plan 3 – after Tribal leaders identified the dilution to the Board – is evidence of discriminatory intent by the Non-Hispanic White Board members.

93. Dot density population maps illustrate the manner in which Adopted Plan 3 prevents the creation of at least four American Indian ability-to-elect districts with effective voting majorities by diluting their voting power in Districts 3 and 5. *Compare* Figure 8 to Figure 9.

**Figure 8. Dot density map of Adopted Plan 3.**



94.     Figure 8 depicts how Adopted Plan 3 dilutes a portion of the predominately American Indian population of Macy by including it in District 5 with a large pocket of Non-Hispanic White voters in the surrounding area. That combination reduces District 5 to a bare majority American Indian VAP of 51.26 percent, which is insufficient for American Indian voters to elect their candidates of choice.

95.     Figure 8 depicts how Adopted Plan 3 dilutes the predominately American Indian community of Walthill by including it in District 3 with Non-Hispanic White voters to the west of the community. That combination reduces District 3 to an American Indian VAP of 59.50 percent, which also is inadequate to allow American Indian voters to elect their candidates of choice.

**Figure 9. Dot density map of Winnebago/Omaha Plan.**



96.     Figure 9 depicts how the Winnebago/Omaha Proposed Plan resolves the dilution by creating four American Indian districts in the northeastern portion of the County.

97.     Figure 9 depicts how by joining the American Indian community of Walthill with more American Indian voters east of the town, the American Indian VAP is increased to 65.93 percent; that percentage could be increased further.

98.     Figure 9 depicts how three additional districts with an American Indian VAP of 85 percent or higher are centered on three distinct American Indian communities: Winnebago (District 1, with an American Indian VAP of 85.58 percent); American Indians in the outlying areas of Winnebago (District 2, with an American Indian VAP of 85.64 percent); and Macy (District 3, with an American Indian VAP of 97.58 percent).

99.     Figure 9 depicts how Non-Hispanic White voters continue to form super-majorities in the southern portion of the County in District 5 (Non-Hispanic White VAP of 66.15 percent) and the distribution of the overwhelmingly Non-Hispanic White community of Pender with Non-Hispanic White voters in the western half of the County in District 6 (Non-Hispanic White VAP of 97.52 percent) and District 7 (Non-Hispanic White VAP of 90.41 percent).

100.     Because of the unlawful dilution of American Indian voting power in Adopted Plan 3 adopted by the Board of Supervisors, American Indian voters will have an equal opportunity to elect the candidates of their choice in only three districts, Districts 2, 4, and 6, instead of in four districts, such as those included in the Winnebago/Omaha Proposed Plan.

101.     Districts 3 and 5 in Adopted Plan 3 do not provide an opportunity for American Indian voters to elect candidates of their choice because they do not "perform" or elect American Indian candidates of choice due to lower political participation of American Indian voters in those districts.

102.     American Indian voters do not have an equal opportunity to elect their candidates of choice in Districts 3 and 5 of Adopted Plan 3 because of barriers to political participation, including: the socio-economic effects of past and present discrimination; turnout disparities; and legally significant racially polarized voting in which Non-Hispanic White voters vote sufficiently as a bloc to usually defeat the candidate of choice of American Indian voters.

103.     As demonstrated by the Winnebago/Omaha Proposed Plan, the Board of Supervisors districts could easily be redrawn to create *four* reasonably compact majority-American Indian districts that more evenly distribute the American Indian residents and provide American Indian voters with an equal opportunity to elect their candidates of choice.

**C.     Board of Supervisors Elections under the 2011 Plan and Adopted Plan 3.**

104.    Members of the current Board of Supervisors were elected under the 2011 Plan and Adopted Plan 3. The 2011 Plan was used for Thurston County's elections from 2012 through 2020.

105.    American Indian candidates for the Board of Supervisors have had limited success under the 2011 Plan and Adopted Plan 3.

106.    Although the American Indian population in Thurston County is the largest racial or ethnic group in Thurston County, the 2011 Plan and Adopted Plan 3 resulted in the election of five Non-Hispanic White Supervisors and just two American Indian Supervisors to the current Board of Supervisors:

    a.    District 1:    Glen Meyer (Non-Hispanic White);

    b.    District 2:    Georgia Mayberry (Non-Hispanic White);

    c.    District 3:    Mark English (Non-Hispanic White);

    d.    District 4:    James Price, Sr. (citizen of Winnebago Tribe of Nebraska);

    e.    District 5:    Davin French (Non-Hispanic White);

    f.    District 6:    Arnie Harlan (citizen of Omaha Tribe of Nebraska); and

    g.    District 7:    Jim Mueller (Non-Hispanic White).

107.    In 2022, Supervisors were elected from the odd-numbered districts under Adopted Plan 3: Districts 1, 3, 5, and 7. Non-Hispanic White candidates won in all four of those districts.

108.    Cheyenne Robinson, the Secretary of the Omaha Tribe, ran and lost in the May 10, 2022, Democratic Primary for the District 3 seat to Jeff Dolezal, a Non-Hispanic White candidate. Dolezal subsequently withdrew from the race, leaving the Non-Hispanic White incumbent Mark English, the Republican candidate, to run unopposed and win the District 3 seat in the November 8, 2022 General Election.

109.    In the 2022 elections, no American Indian candidates ran from Districts 1, 5, or 7

under Adopted Plan 3.

110.    The dilution has resulted from the inclusion of a large voting bloc of Non-Hispanic White voters, the overwhelming majority of whom have not supported the candidate of choice of American Indian voters.

111.    Elections in Thurston County have been characterized by legally significant racial bloc voting by Non-Hispanic White voters.

## V.    DISCRIMINATORY INTENT IN THE ENACTMENT OF ADOPTED PLAN 3

112.    A discriminatory intent claim may be proven by showing, first, that racial discrimination was a "substantial" or "motivating" factor behind the enactment or maintenance of the electoral system and, second, that the system continues today to have some adverse racial impact. *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264–66 (1977). If the plaintiff establishes these two elements, the burden then shifts to the scheme's defenders to demonstrate that the scheme would have been enacted without the purposefully discriminatory factor. *See id.*

113.    Proving discriminatory intent is not restricted to direct evidence; instead, "determining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Rogers v. Lodge*, 458 U.S. 613, 618 (1982) (quoting *Arlington Heights*, 429 U.S. at 266).

114.    In *Arlington Heights*, the United States Supreme Court set out five non-exhaustive factors to determine whether a particular decision was made with a discriminatory purpose, and courts must perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266-68.

115.    The *Arlington Heights* factors include: (1) the historical background of the decision,

(2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, "especially where there are contemporary statements by members of the decision-making body." *Arlington Heights*, 429 U.S. at 267-68.

116.    Evidence of Defendants' discriminatory intent in the adoption of Adopted Plan 3 comes from their failure to provide American Indian voters with meaningful notice and an opportunity to review Adopted Plan 3 before it was enacted, knowledge of the demographics of that Plan, pre-adoption statements, and data provided by the Plaintiffs to the Board that American Indian voters cannot elect the candidate of their choice in Districts 3 and 5 under Proposed Plan 1, Defendants' dilution of the American Indian vote by decreasing the American Indian VAP in Proposed Plan 1 from the 2011 Plan, and in the Defendants' subsequent rescission of Proposed Plan 1 to dilute the American Indian vote more under Adopted Plan 3 by making Districts 3 and 5 under that plan safer for Non-Hispanic White candidates.

117.    The Board of Supervisors also enacted Adopted Plan 3, despite Defendants': (a) knowledge of two previous court orders remedying the unlawful dilution of American Indian voters by prior members of the Board of Supervisors, in *United States v. Thurston County, Nebraska*, Civ. No. 78-0-380 (D. Neb. May 9, 1979) (challenge to the County's at-large system of commissioner elections culminating in a consent decree in which the County agreed to implement two majority American Indian districts) and in *Stabler v. County of Thurston*, 129 F.3d 1015 (8th Cir. 1997) (American Indian plaintiffs secured a third majority American Indian supervisor district in light of the 1990 Census's report that American Indians comprised about 44% of the total population and 35.9% of the VAP in the County); (b) knowledge that demographic changes reported in the 2020 Census, in which American Indians now comprise a majority of Thurston

County's VAP, showed that a fairly drawn Board of Supervisors redistricting plan requires a fourth supervisor district in which American Indians are an effective voting majority; (c) knowledge that a fourth American Indian supervisor district would allow American Indian voters to have a controlling majority of the Board of Supervisors; (d) reduction of District 3 in the 2011 Plan from 68.11 percent following the 2020 Census to 62.64 percent in Proposed Plan 1; (e) knowledge that a VAP of 62.64 percent in District 3 and 52.64 percent in District 5 in Proposed Plan 1 was insufficient to provide American Indian voters with equal opportunities to elect in those districts; and (f) their further reduction of the American Indian VAP from Proposed Plan 1 in District 3 to 59.50 percent and in District 5 to 51.26 percent to deny equal opportunities to elect to American Indian voters in those districts for the next 10 years, taking into account the growing American Indian population in the County and its declining Non-Hispanic White population.

## VI.    VOTE DILUTION UNDER ADOPTED PLAN 3

### A.    *Thornburg v. Gingles*

118.    The U.S. Supreme Court, in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act:

> (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district";
>
> (2) the minority group must be "politically cohesive"; and
>
> (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

119.    The Winnebago/Omaha Proposed Plan (*see* Figures 4-5, 9) demonstrates that the American Indian population in Thurston County is sufficiently numerous and geographically

compact to allow for the creation of four properly apportioned, single-member districts for electing members of the Board of Supervisors, in which American Indian voters would constitute an effective majority of both the total population and the VAP and be able to elect their candidates of choice.

120.    American Indian voters in Thurston County are politically cohesive, having voted overwhelmingly for American Indian candidates of choice over other candidates preferred by Non-Hispanic Whites in recent countywide elections and in other elections. For example, in the 2014 Thurston County Sheriff race, approximately 84 percent of the ballots cast by American Indian voters were for Gary Davis, compared to approximately 14 percent of the ballots cast for Davis by Non-Hispanic White voters. In the 2020 Presential Election, approximately 94 percent of the ballots cast by American Indian voters were for Joseph Biden, compared to approximately 16 percent of the ballots cast for Biden by Non-Hispanic White voters. In the 2020 U.S. Senate race, approximately 84 percent of the ballots cast by American Indian voters were for Chris Janicek, compared to approximately 11 percent of the ballots cast for Janicek by Non-Hispanic White voters.

121.    Countywide elections and other elections under the 2011 Plan show a clear pattern of racially polarized voting. Although American Indian voters are politically cohesive, bloc voting by other members of the electorate consistently defeats the candidates preferred by American Indians in elections in districts in which American Indian voters are not an effective voting majority of the VAP.

122.    Estimated levels of Non-Hispanic White support in countywide elections and elections under the 2011 Plan are insufficient for American Indian candidates of choice to be elected in Districts 3 and 5 of Adopted Plan 3.

**B.     Totality of the Circumstances**

123.    In addition to the facts that satisfy the three *Gingles* preconditions, the totality of the circumstances in this case support Plaintiffs' claim that American Indian residents of Thurston County have less opportunity than other members of the electorate to participate in the political process and elect Board of Supervisor candidates of their choice, in violation of Section 2 of the Voting Rights Act.

124.    There is a long – and well-documented – history of voting discrimination against American Indians in Nebraska. Although the Indian Citizenship Act of 1924 provided that "all non-citizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States," Pub. L. No. 68-175, 43 Stat. 253 (June 2, 1924) (codified at 8 U.S.C. § 1401(b)), Nebraska continued to deny American Indians the right to vote.

125.    Thurston County has twice before been sued successfully for vote dilution in violation of Section 2.

126.    In the first action, the United States successfully challenged Thurston County's use of an at-large method of election for its county governing body, which resulted in the current system of a seven-member County Board of Supervisors elected from single-member districts. *See United States v. Thurston County, Nebraska*, Civ. No. 78-0-380 (D. Neb. May 9, 1979) (settled by consent decree).

127.    In the second action, tribal organizations and an individual American Indian voter successfully challenged Thurston County's redistricting plan adopted following the 1990 Census for diluting American Indian voting strength by not creating a third district in which American

Indian voters had an effective ability-to-elect candidates of their choice. *See Stabler v. County of Thurston*, 129 F.3d 1015 (8th Cir. 1997).

128.    In *Stabler*, the Eighth Circuit found that "the evidence indicates that Thurston County intentionally discriminated against Native Americans because it failed to make adjustments during the 1990 redistricting process in response to the information gathered in the 1990 census demonstrating a shift in the population's racial composition due to the increased Native American population." 129 F.3d at 1022.

129.    The *Stabler* court further found that the "evidence shows that Thurston County maintained its current districting system with a discriminatory intent and thwarted Congress's purpose in amending § 2 in 1982 to provide 'equally open' political processes." *Id.* (quoting *Johnson v. DeGrandy*, 512 U.S. 997, 1018-19 (1994)).

130.    American Indians in Thurston County continue to bear the effects of discrimination, which hinders their ability to participate effectively in the political process.

131.    American Indian residents have a lower socioeconomic status and lag behind Non-Hispanic White residents in a wide range of areas, including employment, income, education, and access to health care.

132.    American Indian residents of Thurston County tend to have lower rates of voter turnout than the County's Non-Hispanic White residents.

133.    The two American Indians currently serving on Thurston County's Board of Supervisors were elected from districts in which American Indian voters are a super-majority of the total population and VAP.

134.    Thurston County's enactment of Adopted Plan 3, which increased the percentage of American Indian VAP in two districts (2 and 4) while further diluting the American Indian VAP

in two other districts (3 and 5) is tenuous, as shown by statements by Chief Deputy Secretary of State Bena that: (a) any plan adopted by the Board would be immunized from a successful legal challenge because of its use of gWorks; (b) gWorks "will not sign off on a map that does not meet legal requirements," or words to that effect; (c) Mr. Bena's erroneous statement that any district that had an American Indian population exceeding 50 percent satisfied the VRA; and (d) Mr. Bena's erroneous statement that increasing the percentage of American Indian population so that there were only four American Indian "board seats could be considered packing."

135.    As described above, Thurston County's elections, including those for its governing Board of Supervisors, are characterized by legally significant racial bloc voting in which Non-Hispanic White residents vote in a manner that typically leads to the defeat of the preferred candidates of choice of American Indian voters.

## COUNT ONE:

**(52 U.S.C. § 10301 and 42 U.S.C. § 1983 - Discriminatory Purpose in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act, Against all Defendants)**

136.    Plaintiffs repeat and re-allege each and every allegation contained in all of the Paragraphs above, as if fully set forth herein.

137.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

138.    Section 1 of the Fourteenth Amendment to the United States Constitution provides that:

No state shall make or enforce any law which shall abridge the privileges

or immunities of citizens of the United States; nor shall any state deprive

any person of life, liberty, or property, without due process of law; nor deny

to any person within its jurisdiction the equal protection of the laws.

139.    Section 1 of the Fifteenth Amendment to the United States Constitution provides

that, "The right of citizens of the United States to vote shall not be denied or abridged by the United

States or by any State on account of race, color, or previous condition of servitude."

140.    Section 2 of the Voting Rights Act of 1965 prohibits the imposition of any voting

standard, practice, or procedure enacted with a discriminatory purpose. 52 U.S.C. § 10301(a).

141.    Defendants' actions in Board of Supervisors District 3 establish their

discriminatory intent against American Indian voters. Specifically, despite the increase in

American Indian VAP and corresponding decrease in Non-Hispanic White VAP in Thurston

County, Defendants lowered the American Indian VAP in District 3 by 8.61 percent: from 68.11

percent (under the 2011 Plan) to 62.64 percent (under Proposed Plan 1), and then to 59.50 percent

(under Adopted Plan 3) after rescinding Proposed Plan 1.

142.    There is no legitimate, non-racial reason for Defendants' rescission of Proposed

Plan 1 and enactment of Adopted Plan 3 to further dilute American Indian voting power in District

3.

143.    Adopted Plan 3 was enacted, at least in part, with the intent to reduce the number

of American Indian voters and increase the number of Non-Hispanic White voters to diminish

American Indian voting strength and prevent them from being able to elect a candidate of choice

to the Board of Supervisors from a fourth supervisor district.

144.    In the last round of redistricting, Non-Hispanic White Supervisors adopted the 2011

Plan, which created three super-majority American Indian districts, Districts 2, 4, and 6. The Non-

Hispanic White Supervisors created an additional two districts in which American Indians were a

nominal majority of the VAP, knowing based upon previous election results that those districts would continue to perform as safe districts for Non-Hispanic White candidates who would continue to be elected. In particular, District 5 was established with an American Indian VAP of 52.76 percent, offset by significantly higher participation rates among the 45.2 percent of the district's VAP that was Non-Hispanic White. District 3 had a higher American Indian VAP of 64.80 percent, but that was offset by a Non-Hispanic White VAP that overperformed its VAP of 33 percent. Election data from the County establishes a repeated pattern of racial bloc voting and depressed voter participation in which the American Indian VAP must be an effective voting majority to offer American Indian voters with equal opportunities to elect their chosen candidates.

145.    Following the 2020 Census, the 2011 Plan had an American Indian VAP of 68.11 percent in District 3.

146.    According to the 2020 Census, District 3 was slightly underpopulated, with a deviation of a -7.29 percent, or approximately 75 people less than what was required for the ideally populated district. Defendants could have reduced District 3's deviation and made it an effective performing majority-American Indian district by adding approximately three dozen American Indians of voting age.

147.    Instead, the Defendants did just the opposite, adding 35 more Non-Hispanic Whites of voting-age to District 3 despite the decrease in Non-Hispanic White VAP in Thurston County. Defendants intentionally diluted the American Indian vote in District 3 by increasing the Non-Hispanic Whites of voting-age from 172 to 207, while decreasing the American Indians of voting-age in the district from 393 to 389. Those changes in Proposed Plan 1 reduced the American Indian VAP in District 3 from 68.11 percent to 62.64 percent.

148.    In response to the proposed district lines in Proposed Plan 1, following release of the 2020 Census data, the Omaha and Winnebago Tribes and American Indian voters pointed out that: (a) the American Indian population in the County had increased to 57.5 percent of the total population and 50.3 percent of the VAP, while the Non-Hispanic White population had decreased to 36.1 percent of the total population and 43.5 percent of the VAP; (b) racial bloc voting and depressed registration and turnout due to past and present discrimination required that majority-American Indian districts have a VAP providing an effective voting majority to provide equal opportunities to elect; and (c) the districting plan should include four geographically compact American Indian districts that met that threshold.

149.    The Board of Supervisors instead enacted Proposed Plan 1.

150.    The Board of Supervisors subsequently rescinded Proposed Plan 1. The Omaha and Winnebago Tribes and American Indian voters offered Plan 2 as an alternative to replace Proposed Plan 1. Supervisor Price (Winnebago Tribal citizen) moved to adopt the Winnebago/Omaha Proposed Plan, but no Non-Hispanic White Supervisors seconded, with Supervisor Harlan (Omaha Tribal citizen) absent.

151.    Instead, the five Non-Hispanic White Supervisors enacted Adopted Plan 3, with Supervisor Price (Winnebago Tribal citizen) voting no and Supervisor Harlan (Omaha Tribal citizen) absent.

152.    In doing so, the five Non-Hispanic White Supervisors intentionally targeted changes to Districts 3 and 5 to lower the American Indian VAP further to make those districts even safer for Non-Hispanic White incumbents. Although the Non-Hispanic White VAP declined by nearly five percentage points from 2010 (from 48.4 percent to 43.5 percent), the Board of Supervisors did the following:

a.     Decreased the American Indian VAP in District 3 by over three percentage points from 62.64 percent down to 59.50 percent. That increased the Non-Hispanic White VAP in the district from 33 percent when it was originally enacted in 2011 to 36.9 percent of the VAP under the 2020 Census; and

b.     Decreased the American Indian VAP in District 5 by approximately 1.5 percentage points from 52.84 percent to 51.26 percent. The Non-Hispanic White VAP in the district is 42 percent under the 2020 Census.

153.    Other indicia of discriminatory purpose are present in this case. There is evidence of substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision, including contemporaneous statements by decision makers. The Board of Supervisors provided virtually no notice of their desire to rescind the already dilutive Proposed Plan 1 in favor of a more dilutive Adopted Plan 3, sought to minimize or eliminate public comment, and expedited the legislative process in ways intended to reduce input from anyone other than its main proponents, the Supervisors who approved Adopted Plan 3.

154.    Neither of the two American Indian Supervisors voted in favor of Adopted Plan 3.

155.    By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act and will continue to violate those rights absent relief granted by this Court.

## COUNT TWO:

**(52 U.S.C. § 10301 and 42 U.S.C. § 1983 – Discriminatory Effect in Violation of Section 2 of the Voting Rights Act, Against All Defendants)**

156.    Plaintiffs repeat and re-allege each and every allegation contained in all of the Paragraphs above, as if fully set forth herein.

157.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

158.    As explained in detail above, the American Indian population in Thurston County is sufficiently numerous and geographically compact to allow for the creation of four properly apportioned, single-member districts for electing members of the Board of Supervisors, in all of which American Indian voters would constitute an effective voting majority of the VAP.

159.    The American Indian voters in the County are politically cohesive, and elections in the County show a clear pattern of racially polarized voting. These facts satisfy the three "*Gingles* preconditions."

160.    As explained in detail above, the totality of the circumstances establishes that Adopted Plan 3 has the effect of denying American Indian voters an equal opportunity to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

161.    By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

162.    Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Board of Supervisors using the current, unlawful Adopted Plan 3.

### VII.   **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully pray that the Court:

a.      Declare that the current Adopted Plan 3 used for County Board of Supervisor elections violates 42 U.S.C. § 1983 because Defendants acted and continue to act under of color of law to deny the Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act;

b.      Permanently enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections in Thurston County, Nebraska under the current Adopted Plan 3;

c.      Order the implementation of a new districting plan for the Thurston County Board of Supervisors that complies with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

d.      Award Plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action; and,

e.      Order such additional relief as the interests of justice may require.

Respectfully submitted this 19th day of January, 2023.

By: s/ Michael S. Carter
Michael S. Carter
OK No. 31961
E-mail: carter@narf.org
Allison A. Neswood
CO No. 49846
E-mail: neswood@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302

Samantha B. Kelty
AZ No. 024110, TX No. 24085074
E-mail: kelty@narf.org
NATIVE AMERICAN RIGHTS FUND

By: s/ Jennifer Bear Eagle
Jennifer Bear Eagle
NE No. 24031
Email: beareagle@bigfirelaw.com
Nicole E. Ducheneaux
NE No. 25386
E-mail: nducheneaux@bigfirelaw.com
Lillian M. Alvernaz
MT No. 58335824
E-mail: lalvernaz@bigfirelaw.com
Big Fire Law and Policy Group, LLP
1905 Harney Street, Suite 300
Omaha, Nebraska 68102
Telephone: (531) 466-8725
Facsimile: (531) 466-8792

950 F Street NW, Suite 1050,
Washington, D.C. 20004
(202) 785-4166 (direct)

By: s/ James Thomas Tucker*
Ezra Rosenberg*
DC No. 360927
E-mail: erosenberg@lawyerscommittee.org
James Thomas Tucker
AZ No. 019341
E-mail: jtucker@lawyerscommittee.org
Jennifer Nwachukwu*
DC No. 1644313
E-mail: jnwachukwu@lawyerscommittee.org
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600 (main)

*Attorneys for the Plaintiffs*
*\*Application for Admission Pending*

*Attorneys for the Winnebago Tribe of
Nebraska, Victoria Kitcheyan, Brian
Chamberlain, Rona Stealer, James Louis
LaRose, Aric Armell, Esther Mercer, and
Lynelle Blackhawk*